Andrew J. Gramajo, CA # 338144
AJG LAW GROUP, PC.
25A Crescent Dr. #402
Pleasant Hill, CA 94523
T:(415) 638-9140
E: Andrew@Ajglawgroup.us

*Attorney for Plaintiff*
*Zhengyu Zhang*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| ZHENGYU ZHANG,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>EQUIFAX INFORMATION SERVICES, LLC, TRANS UNION LLC, and ESSEX PROPERTY TRUST, INC.,<br><br>　　　　　Defendants. | Case No.: 5:25-cv-05716<br><br>**COMPLAINT and JURY TRIAL DEMAND**<br><br>**1. FCRA, 15 U.S.C. § 1681,** *et seq.* |

　　　Plaintiff Zhengyu Zhang brings this action on an individual basis, against Defendants Equifax Information Services, LLC ("Equifax") and Trans Union LLC ("Trans Union") (collectively, Equifax and Trans Union are the "CRA Defendants"), and Essex Property Trust, Inc. ("Defendant EPT" or "EPT") and states as follows:

<u>**INTRODUCTION**</u>

　　　1.　　Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq.*

　　　2.　　More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1] Federal Law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure

1

that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests. This lawsuit arises from Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer

reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

9.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period

beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

11.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U. S.C. § 1681(a)(4).

12.     The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

13.     Plaintiff's claims arise out of the Defendants plainly deficient reinvestigations considering Plaintiff's multiple disputes and repeated notice that he was a victim of identity theft.

14.     Accordingly, Plaintiff brings claims against the CRA Defendants, for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. § 1681c-2.

15.     Further, Plaintiff also brings claims against the Furnishers, Defendant EPT for

failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

16.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

19.    Plaintiff is a natural person residing in San Jose, California, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20.    Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of California, including within this District. Equifax can be served at its registered agent for service Corporation Service Company at 2 Sun Court, Suite 400 Peachtree Corners, Georgia 30092. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f).

21.    Trans Union is a corporation with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of Utah, including within this District. Trans Union can be served at its registered agent for service Illinois Corporation Service Company at 801 Adlai Stevenson Drive Springfield, Illinois 62703. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f).

22.     EPT is real estate investment trust company with its headquarters in San Mateo, California, and is authorized to do business in the State of California, including within this District. EPT can be served through its registered agent for service Anne Morrison, located at 1100 Park Place, Suite 200, San Mateo, CA 94403.  EPT is a "Furnisher" as defined in 12 CFR 1022.41.

### SUMMARY OF THE FAIR CREDIT REPORTING ACT

23.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

24.     Congress recognized that CRAs such as Equifax and Trans Union "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."  15 U.S.C. § 1681(a)(3).  Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."   15 U.S.C. § 1681(a)(4).

25.     For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

26.     The first form of protection is the "block."  When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

a. Appropriate proof of the identity of the consumer;

b. A copy of an identity theft report;

c. The identification of such information by the consumer; and,

d. A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

27. The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

28. Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer, and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the request. Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

29. The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the CRA Defendants here.

30. A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.[2] 15 U.S.C. § 1681c-1(i)(1). Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

31. Once placed, a security freeze does not expire. A CRA can remove a security freeze **only** at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A). Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze." 15 U.S.C. § 1681c-1(i)(3)(C).

32. The fourth and final form of protection the FCRA provides for identity theft victims

is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may **only** release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c). No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. 15 U.S.C. § 1681e(a).

33. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

34. Similarly, the FCRA also imposes a duty upon the Furnishers, such as Oriental, to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. § 1681s-2b).

35. The FCRA provides consumers with a private right of action against consumer reporting agencies, such as the CRA Defendants, and data furnishers such as Oriental, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## FACTUAL ALLEGATIONS
### Identity Theft

36. In January 2023, Plaintiff lost his wallet on a plane. United Airlines mailed Plaintiff's wallet back via FedEx. The parcel was delivered to Plaintiff's apartment in the package room.

37.     On or about January 12, 2023, someone broke into the package room, and Plaintiff's package with wallet was one of the items stolen.

38.     On or about March 7, 2023, Plaintiff received a notification from Chase Bank that someone changed Plaintiff's address and also requested replacement credit and debit cards to an address that is not Plaintiff's.

39.     Plaintiff went to a Chase branch, where bankers helped Plaintiff close the account.

40.     The following day, March 8, 2023, Plaintiff filed a police report (the "First Police Report") with the San Jose Police Department stating that he lost his wallet on the plane, stating that in the wallet were his driver's license, credit cards, and debit cards.

41.     On or about March 9, 2023, Plaintiff filed another police report (the "Second Police Report") with the San Jose Police Department stating that his driver's license was stolen, and that he received multiple notifications regarding the opening of bank accounts and auto loans that he didn't authorize.

42.     On or about June 5, 2023, Plaintiff filed a third police report (the "Third Police Report") with the San Jose Police Department, in which he reported unknown vehicles registered under his name without his knowledge or consent.

43.     On or about June 9, 2023, Plaintiff filed a report with the Department of Motor Vehicles (the "DMV Report") stating that after the incident on January 12, 2023, he became a victim of identity theft; three vehicles were fraudulently purchased using his driver's license; and the vehicles were registered under his name without his knowledge or consent. Plaintiff learned about this when Plaintiff received vehicle registrations to his home address.

44.     On or about June 15, 2023, Plaintiff filed an FTC Affidavit report reporting all the accounts opened fraudulently in his name he was aware of at that time. Specifically, the FTC

Affidavit included the following fraudulent information:

- Capital One, partial account number *5587 with a $7000 balance;

- Credit First, partial account number *1113, with a $868 balance;

- Mercedes-Benz Financial account with a $47,192 balance,

- Essex Property Trust account with a $3,514 balance;

- Ally Bank, account number 228194221146, balance $29283;

- Address: 1830 10th Av Oakland CA 9460,

- Employment information: Tesla (inaccurate at the time of reporting);

- Credit Inquiries: Lithia Motors/Driveway Finance, Yosemite Motors, DSRM National bank/Valero, Capital One(3423), Ally Financial(3223), Beneficial state bank(22823), Yosemite Motors(22623), DSRM National Bank(22423), CBNA(22423), Macys Citibank(22323), Capital one(22223), Citibank Best buy(22223), Ally Financial(22223) Transunion: CFNA(3523), Mission Lane(3523), COAF(3423), AmeriCredit(3423), ONE MAIN(3223), Mercedes Ben(22823), MB FIN SVCS(22823), JPMCB Auto(22823), ESBHarley(22623), SYNCB (22323), Tracy Moto(22323), Capibass(22223)

- Other fraudulent accounts: T-Mobile (6923)

- Fraudulent checks from JP Morgan Chase under Plaintiff's checking account on for $900 and for $1000.

45.     On or about July 7, 2023, after Plaintiff contacted Mercedes Benz Financial Services to inform it of the fraudulent account, Mercedez Benz Financial Services acknowledged the fraudulent activity and agreed to remove the account from Plaintiff's credit files. Upon information and belief, Mercedez Benz Financial Services requested that the CRAs remove the

account from Plaintiff's credit file(s) because it was opened fraudulently, putting the CRA Defendants on notice of Plaintiff's identity theft situation.

46.     On or about August 17, 2023, Plaintiff filed another police report (the "Fourth Police Report") with the Oakland Police Department. The fraudster(s) leased an apartment in Oakland, California, that is not associated with the client (the "Broadway Lease"). At that time, the current address of the Plaintiff was in San Jose, California.

47.     On or about January 12, 2024, Plaintiff filed another police report (the "Fifth Police Report") with the San Jose Police Department, reporting yet another fraudulent account in his name, Credence Resource Management (original creditor AT&T).

48.     On January 13, 2024, Plaintiff filed another FTC Affidavit (the "Second FTC Affidavit") reporting fraudulent hard inquiries and fraudulent accounts opened in his name. In FTC Affidavit, Plaintiff listed the Essex Property Trust Account, the Credence Resource Management Account, the Broadway Lease,  several addresses that did not belong to him, a phone number that did not belong to him, and multiple hard inquiries that were initiated without Plaintiff's consent, including, but not limited to, hard inquiries by Mission Lane, CFNA, and AmericCredit.

**Plaintiff's Dispute to the CRA Defendants January – February 2024**

49.     Concerned about the fraudulent activity on his credit files and reports, which was negatively impacting his credit and credit standing, Plaintiff felt he needed to escalate the issue to prevent further damage.

50.     In or around February 2024, Plaintiff disputed the fraudulent information with the CRA Defendants. Plaintiff disputed that the fraudulent information was not his, but rather the product of fraud and identity theft ("Plaintiff's First Dispute"). Specifically, Plaintiff disputed the Credence Resource Management (AT&T) account, Essex Property Trust account, and the fraud-related hard inquiries appearing on his Trans Union's and Equifax's reports.

51.    Plaintiff requested that Trans Union and Equifax remove and block the identity theft information from his credit files.

52.    Upon information and belief, each of the CRA Defendants sent Defendant EPT an automated credit dispute verification ("ACDV") pursuant to Plaintiff's dispute of the Essex Property Trust account, and forwarded a copy of the dispute with Plaintiff's supporting document, including, but not limited to, the FTC Affidavit and police report.

53.    Upon information and belief, in response to the ACDV it received from each CRA Defendant, Defendant EPT informed the CRA Defendants that the Essex Property Trust account should be deleted from Plaintiff credit files.

54.    On or about February 3, 2024, Trans Union removed the disputed accounts and inquires in response to Plaintiff's dispute.

55.    Upon information and belief, Equifax removed the disputed accounts in response to Plaintiff's dispute.

**Plaintiff Discovers Additional Fraudulent Information on His Credit Reports May 2024**

56.    In or around May 2024, Plaintiff applied for a position at Tesla as a Sr. Robotics Machine Learning Engineer. Tesla extended an offer to Plaintiff on the condition that he pass his credit report check.

57.    Therefore, on or about May 24, 2024, Tesla contracted with ESS Background Screening to obtain a copy of Plaintiff credit file. Upon information and belief, Defendant Trans Union, in accordance, with its standard procedures, prepared and sold Plaintiff's credit report to ESS Background Screening, who resold the information on the report to Tesla.

58.    Shortly thereafter, a Tesla representative informed Plaintiff that Tesla could not move forward with its offer of employment because of negative information found on Plaintiff's

credit report. Specifically, Trans Union was reporting a collection account, Sequium Asset Solutions, Inc. ("Sequium"), with a balance of $1,452, which did not belong to Plaintiff but was rather the result of fraudulent activity.

59.     Plaintiff explained to Tesla that he is a victim of identity theft. However, Tesla could not move forward with Plaintiff's employment until the reporting was corrected.

60.     Thereafter, Plaintiff obtained copies of his credit reports from the CRA Defendants and, upon review, saw more fraudulent information in his consumer files/reports, including the Sequium account.

61.     On May 31, 2024, Plaintiff filed a third FTC Affidavit reporting a fraudulent Sequium Asset Solutions Inc. account, which had a balance $1,452, as well as multiple addresses that Plaintiff was never associated with. Plaintiff also filed another police report concerning the Sequium account.

**Plaintiff's June 2024 Dispute to Trans Union**

62.     As of May 3, 2024, Trans Union was reporting the following fraudulent information on Plaintiff's credit file (collectively, the "TU May 2024 Fraudulent Info"):

(i)     The Sequium Asset Solutions Inc. account, with a balance of $1,452

(ii)     Addresses in Stockton, California, and Walnut Creek, California; and

(iii)     Hard Inquiries, including:

| Creditor | Address | Date(s) |
|---|---|---|
| Credit Wise Capital1 TU-C | Capital One N.A. PO BOX 85870 Richmond, VA 23285 | 04/19/2024 |
| Capital One | PO Box 31293 Salt Lake City, UT 84131 | 07/11/2023 |
| Zhengyu Zhang via Credit Wise Capital1 TU-A | Capital One N.A. PO BOX 85870 Richmond, VA 23285 | 04/08/2024,   03/10/2024, 02/12/2024,   01/14/2024, 12/18/2023,   11/19/2023, 10/23/2023,   09/24/2023, 08/28/2023,   07/30/2023, |

| | | 07/02/2023 |
|---|---|---|
| 846827874 via Credit Wise Capital1 TU-B | Capital One N.A. PO BOX 85870 Richmond, VA 23285 | 09/16/2023 |
| Mercedes Benz Financial | 36455 Corporate Drive Farmington Hills, MI 48331 | 05/16/2023 |
| QuinStreet | 950 Tower Lane  Foster City, CA 94404 | 05/01/2023 |
| TURO INC | 667 Mission Street 4th Floor San Francisco, CA 94105 | 04/13/2023,    04/11/2023, 04/11/2023 |
| Tuci-Dc Targeted | 100 Cross Street Suite 101 San Luis Obispo, CA 93401 | 03/07/2023 |
| Pay Tomorrow | PO Box 105286 Atlanta, GA 30304 | 03/06/2023 |
| Upstart Network Inc | 2 Circle Star Way 2nd Floor San Carlos, CA 94070 | 03/05/2023,    02/27/2023, 02/24/2023 |
| GM Financial | 801 Cherry Street Fort Worth, TX 76102 | 03/04/2023 |
| Barbaras Test via Rollick INC | 13215 Bee Cave PARKWAY SUITE A220 Austin, TX 78738 | 03/04/2023 |
| Synchrony Bank | PO BOX 71723 Philadelphia ,PA 19176 | 03/03/2023 |
| American First Finance | PO BOX 565848 Dallas, TX 75356 | 03/03/2023 |
| Ally Financial | 200 Renaissance CTR Detroit, MI 48265 | 03/02/2023, 02/22/2023 |
| Capital One via Dealer | P.O.BOX 259407 Plano, TX75025 | 02/28/2023 |
| Carvana LLC | 1930 W Rio Salado PKWY Tempe, AZ 85281 | 02/27/2023,02/25/2023,02/ 23/2023, 02/22/2023 |
| Upgrade | 275 Battery ST Suite 2300 San Francisco, CA 94111 | 02/24/2023 |
| Lendingpoint LLC | 1201 Roberts BLVD Suite 200 Kennesaw, GA 30144 | 02/24/2023 |
| Webbankavant LLC | 222 N Lasalle ST Suite 1600 Chicago, IL 60601 | 02/24/2023 |
| UPGRADE | 275 Battery ST Suite 2300 San Francisco, CA 94111 | 02/24/2023 |
| Lending Club Bank | 595 Market ST Suite 200 San Francisco, CA 94105 | 02/24/2023 |
| Capital One NA | 15070 Capital One DR Richmond, VA 23238 | 02/22/2023 |
| Prog Leasing LLC | 256 W Data Drive Draper, UT 84020 | 02/22/2023 |
| Ftprog Leasing LLC | 256 Data Drive Draper, UT 84020 | 02/22/2023 |
| Capital One | PO BOX 30281 Salt Lake City, UT 84130 | 02/22/2023 |

| Capital One | 15000 Capital One Drive US 565724 Richmond, VA 23238 | 02/22/2023 |
|---|---|---|

63.     On or about June 17, 2024, Plaintiff disputed the TU May 2024 Fraudulent Info with Trans Union (the "June 2024 TU Dispute"). Plaintiff asked Trans Union to investigate and remove and block the May 2024 Fraudulent Info. Plaintiff provided supportive documentation along with his dispute, including, but not limited to, his driver's license, social security card, police report(s), and FTC identity theft affidavit(s).

64.     On or about June 26, 2024, according to USPS, Plaintiff's June 2024 TU Dispute with Trans Union was successfully delivered.

65.     On or about July 22, 2024, Plaintiff obtained his updated Credit report with Trans Union and saw that Trans Union successfully removed the disputed May 2024 Fraudulent Info.

66.     On or about July 31, 2024, Plaintiff obtained another updated TransUnion report, and the previously deleted information was no longer visible.

67.     Plaintiff was eventually able to secure the employment position at Tesla, but not without significant delay which resulted in the loss of income, bonus incentives, and other economic opportunities.

### Plaintiff's June 2024 Dispute to the Equifax

68. As of May 3, 2024, Equifax was reporting the following fraudulent information on Plaintiff's credit file (collectively, the "EQ May 2024 Fraudulent Info"):

Account: Sequium Asset Solutions INC, original creditor Comcast, balance $1,452, Date opened 01/02/2024;

Addresses: 326 N Barlett Street, Medford Medford, OR 97501;

PO Box 30253, Salt Lake City, UT  84130-0253;

200 Renaissance Center Detroit, MI 48265;

1438 Webster ST STE 100 Oakland, CA 94612-1214;

439 E Yosemite AVE Manteca, CA 95336;

PO Box 631, Amarillo, TX 79105-0631;

PO BOX 6241, SIOUX FALLS, SD 57117;

PO Box 8218, Mason, OH 45040-8218;

PO Box 6497, Sioux Falls, SD 57117-6497;

3093 BROADWAY UNIT 508 OAKLAND, CA 94611.

Hard Inquiries:

| Creditor | Address | Date(s) |
|---|---|---|
| Lithia Motors/Driveway Finance | 326 N Barlett Street, Medford Medford, OR 97501 | Mar 04, 2023 |
| Capital One | PO Box 30253 Salt Lake City, UT 84130-0253 | Mar 04, 2023 |
| Ally Financial | 200 Renaissance Center Detroit, MI 48265 | Mar 02, 2023 |
| Beneficial State Bank | 1438 Webster ST STE 100 Oakland, CA 94612-1214 | Feb 28, 2023 |
| Yosemite Motors | 439 E Yosemite AVE Manteca, CA 95336 | Feb 26, 2023 |
| DSRM NATIONAL BANK/VALERO | PO Box 631 Amarillo, TX 79105-0631 | Feb 24, 2023 |
| CBNA | PO BOX 6241 SIOUX FALLS, SD 57117 | Feb 24, 2023 |
| MACYS/DSNB | PO Box 8218 Mason, OH 45040-8218 | Feb 23, 2023 |
| BEST BUY | PO Box 6497 Sioux Falls, SD 57117-6497 | Feb 22, 2023 |

69.    On or about June 17, 2024, Plaintiff disputed the EQ May 2024 Fraudulent Info with Equifax (the "June 2024 EQ Dispute"). Plaintiff sent his dispute via certified mail. Plaintiff provided supportive documentation along with his dispute, including, but not limited to, his driver's license, social security card, a police report, and a FTC identity theft affidavit.

70.     On or about June 26, 2024, according to USPS, Plaintiff's first copy of June 2024 EQ Dispute was successfully delivered to Equifax.

**Defendant Equifax's Unreasonable Reinvestigation of Plaintiff's June 2024 Dispute**

71.     On or about July 3, 2024, Plaintiff received a reply from Equifax stating "inquiries are a factual record of a file access" and indicated that it would not remove the disputed inquiries.

72.     On or about July 7, 2024, Plaintiff received a reply from Equifax stating that it would not block the disputed information, but also that the disputed [Sequium] account was not currently reporting on Plaintiff's Equifax report.

73.     On or about July 31, 2024, Plaintiff obtained his updated Credit report with Equifax, and saw that Equifax successfully removed the disputed account and address, but failed to remove any of the hard inquiries which were disputed in June 2024. Additionally, Equifax was reporting another two (2) fraudulent accounts—Mercedes-Benz Financial SVCS and Synchrony Secured Install.

74.     Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

75.     Defendant Equifax failed to reinvestigate Plaintiff's June 2024 EQ Dispute and failed to block all of the disputed fraudulent information.

76.     Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed hard Inquiries were the product of identity theft.

77.     Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed fraudulent information from Plaintiff's Equifax credit file.

**Plaintiff Applies for Credit with FI Connect, LLC ("FI Connect") and Gets Denied**

78.    In or around September, Plaintiff applied for credit with FI Connect. For FI Connect to make a determination on Plaintiff's credit application, it would need to obtain a copy of Plaintiff credit file.

79.    Therefore, upon information and belief, FI Connect contracted with Equifax to obtain a copy of Plaintiff's credit file in connection with Plaintiff's credit application.

80.    Upon information and belief, on or about October 1, 2024, Equifax prepared and sold a consumer report concerning Plaintiff to FI Connect.

81.    Thereafter, FI Connect informed Plaintiff that his credit application was denied.

82.    Upon information and belief, the credit report Equifax provided FI Connect contained the EQ May 2024 Fraudulent Info, including the Essex Property Trust account.

83.    Upon information and belief, the EQ May 2024 Fraudulent Info contributed to FI Connect's decision to deny Plaintiff credit.

84.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report it maintained and Published to FI Connect concerning Plaintiff.

**Plaintiff Applies for an Auto Loan with JP Morgan Chase Bank ("JPMCB")**

85.    On or about October 2, 2024, Plaintiff applied for an auto loan with JPMCB. For JPMCB to make a determination on Plaintiff's credit application, it would need to obtain a copy of Plaintiff credit file.

86.    Therefore, upon information and belief, JPMCB contracted with Trans Union to obtain a copy of Plaintiff's credit file in connection with Plaintiff's credit application.

87.    Upon information and belief, on or about October 2, 2024, Trans Union prepared

and sold a consumer report concerning Plaintiff to JPMCB.

88.    Thereafter, Plaintiff was approved for the auto loan, but at an unusually higher rate than expected.

**Plaintiff Reviews His Trans Union Credit Report October 2024**

89.    After reviewing an updated Trans Union report dated October 8, 2024, Plaintiff learned that the previously disputed and deleted fraudulent account with ESSEX PROPERTY TRUST (Account no.: 690240691406****; Date opened: 11/01/2023; Balance: $38,822), as well as the previously disputed hard inquiries were reinserted in Plaintiff's Trans Union credit file (the "Reinserted TU Fraudulent Info").

90.    Plaintiff was distressed and frustrated at the sight of the reappearance of fraudulent credit history that he has been fighting to remove for almost a year.

91.    Upon information and belief, the credit report Trans Union sold to JPMCB in connection with Plaintiff's auto loan application included the Reinserted TU Fraudulent Info.

92.    Upon information and belief, Plaintiff's auto loan application was approved at less favorable terms as a result of the Reinserted TU Fraudulent Info included in the consumer report Trans Union provided JPMCB.

93.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report it maintained and published to JPMCB concerning Plaintiff.

**Defendant EPT's Unreasonable Dispute Investigation**

94.    Upon information and belief, Defendant EPT received an ACDV from the CRA Defendants in response to Plaintiff's First Dispute.

95.    Upon information and belief, Defendant EPT either did not respond to the ACDVs or instructed the CRA Defendant to remove the disputed Essex Property Trust Account from

Plaintiff credit file.

96.    However, after the disputed Essex Property Trust Account was removed from Plaintiff's credit file, Defendant EPT continued to report the disputed account to Defendant Trans Union.

97.    Thus, Defendant EPT violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed information did not belong to Plaintiff.

### Plaintiff's November 2024 Dispute to the Trans Union

98.    On or about November 5, 2024, Plaintiff mailed a dispute letter to Trans Union (the "November 2024 TU Dispute").  Plaintiff specifically disputed the Reinserted TU Fraudulent Info and requested that Trans Union block and remove the information. Plaintiff provided supportive documentation along with his dispute, including, but not limited to, his driver's license, social security card, a police report, and a FTC identity theft affidavit.

99.    Upon information and belief, the November 2024 TU Dispute was delivered to Trans Union on November 12, 2024.

### Defendant Trans Union's Unreasonable Reinvestigation
### of Plaintiff's November 2024 Dispute

100.    On or about November 16, 2024, Plaintiff received a reply from Trans Union stating that they removed the disputed Essex Property Trust Account from Plaintiff's Trans Union credit report.

101.    However, on or about November 22, 2024, Plaintiff received another dispute reply from Trans Union stating that the previously deleted Essex Property Trust Account had been verified..

102.    On or about December 14, 2024, Plaintiff obtained his updated Credit report with Trans Union, and saw that the fraudulent Essex Property Trust Account was still being reported on his Trans Union credit report. In addition, Plaintiff found the following unrecognized fraudulent account on his credit report (the "Fraudulent Collection Account"):

Account name: Collection Bur of Amer.
Account Number: 1865****
Balance: $615
Date opened: 01/10-2024
Original Creditor: Pacific Gas and Electric

103.    Defendant Trans Union allowed for the reinsertion of the previously disputed fraudulent information.

104.    Upon information and belief, Defendant Trans Union continues to report the fraudulent information, including, but not limited to, the Essex Property Trust Account.

105.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed hard Inquiries were the product of identity theft.

106.    Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed fraudulent information from Plaintiff's Equifax credit file.

**Defendant EPT's Unreasonable Dispute Investigation of Plaintiff's November 2024 Dispute**

107.    Upon information and belief, Defendant Trans Union sent Defendant EPT an ACDV along with a copy of Plaintiff's dispute in connection with Plaintiff's November 2024 TU Dispute, which was received by Defendant EPT.

108.    Upon information and belief, Defendant EPT failed to adequately review all of the information provided to it by Plaintiff through Defendant Trans Union.

109.    Upon information and belief, Defendant EPT verified the disputed Essex Property Trust Account as accurate in response to Defendant Trans Union's ACDV.

110.    Defendant EPT violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed information did not belong to Plaintiff.

## Plaintiff's Damages

111.    Plaintiff did exactly what she should have done upon realizing he was the victim of identity theft.

112.    Plaintiff contacted Defendant EPT and disputed the Essex Property Trust Account as the product of fraud and identity theft.

113.    Plaintiff filed a police report regarding the identity theft.

114.    Plaintiff filed an FTC Identity Theft Report.

115.    Plaintiff disputed with the CRA Defendants.

116.    Plaintiff identified himself as an identity theft victim.

117.    Defendant Equifax removed both of the disputed Essex Property Trust Account that was the product of identity theft upon Plaintiff's request.  Notably, Defendant Trans Union did not.

118.    Instead, Defendant Trans Union disregarded Plaintiff's credible dispute.

119.    Despite Plaintiff's disputes of the Essex Property Trust Account which was the product of fraud, Defendant Trans Union hardly waivered in its refusal to block the same.

120.    Plaintiff reasonably believes that Defendant EPT failed to conduct a reasonable investigation, failed to have the disputed fraudulent Essex Property Trust Account removed from Plaintiff's Trans Union credit file, verified the fraudulent Account as accurate to Defendant Trans

Union and in so doing inaccurately suggested that Plaintiff opened the fraudulent Account.

121.    Plaintiff reasonably believes that the CRA Defendants continue to inaccurately publish the dispute fraudulent information in Plaintiff's consumer reports.

122.    As a direct result of the CRA Defendants' ardent refusal to remove the disputed Fraudulent Accounts which were a product of identity theft, the CRA Defendants have continued to saddle Plaintiff with the Fraudulent information which were the product of identity theft.

123.    Further, as a direct result of Defendant EPT's verification of the disputed fraudulent information to at least Defendant Trans Union, Defendant EPT has continued to saddle Plaintiff with the fraudulent Essex Property Trust Account which was the product of identity theft.

124.    Due to Defendants' ardent refusal to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

125.    Further, and due to Defendants' inexplicable refusal to remove the disputed fraudulent information from an identity theft victim's credit file, Plaintiff expended countless hours disputing the same, to no avail.

126.    Defendants' conduct disrupted Plaintiff's life.

127.    In addition to impacting her work productivity and income, dealing with the consequences of Defendants' conduct has taken Plaintiff away from time she would otherwise have spent with her friends and family.  It has taken a toll on Plaintiff.

128.    Plaintiff has reasonably lost countless hours suffering and worrying over whether someone would seek to collect the outstanding balances on the fraudulent Essex Property Trust Account from him.

129.    Defendants' conduct has caused Plaintiff extreme and ongoing stress and

anxiety.  Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes.  Further, Plaintiff reasonably believes that the Fraudulent information have negatively impacted and depressed his credit score.

130.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

131.    At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

132.    The CRA Defendants have a long history of disregarding the credit reporting rights of identity theft victims under the FCRA.  For example, in the very similar matter of *April Hendrix vs. Equifax, et. al.*, (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued several CRAs, including the CRA Defendants, over their repeated wrongful removal of security freezes, release of her credit reports for impermissible purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

133.    The *Hendrix* suit put the CRA Defendants on notice several years ago that its policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

134.    The CRA Defendants have had years of notice in the form of federal lawsuits, despite it all, the CRA Defendants did not take any better steps to protect the Plaintiff here.

135.    The internal policies and procedures of the CRA Defendants do not appear to place any value on its obligations under the FCRA to report credit entries accurately or to reinvestigate

carefully when notified of consumer disputes.

136.    As a standard practice, the CRA Defendants do not conduct independent investigations in response to consumer disputes.  Instead, it merely parrots the response of the data furnishers, like Defendant EPT here, despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

137.    The Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Defendants' violations of the FCRA are willful.

138.    The Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

139.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an open and derogatory account that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove an fraudulent information that was the product

of identity theft.

140.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendants.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to**
**Assure Maximum Possible Accuracy**
**(First Claim of Relief Against Defendant Equifax and Defendant Trans Union)**

141.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

142.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

143.    On at least one occasion, the CRA Defendants prepared patently false consumer reports concerning Plaintiff.

144.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, the CRA Defendants readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by publishing fraudulent information on Plaintiff's credit file(s).

145.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

146.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or

follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

147.    As a result of the CRA Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove fraudulent information that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove fraudulent information that was the product of identity theft.

148.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the CRA Defendants.

149.    The CRA Defendants' conduct, actions, and inactions were willful, rendering Defendants Equifax and Trans Union liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, the CRA Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

150.    Plaintiff is entitled to recover attorneys' fees and costs from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim of Relief Against Defendant Equifax and Defendant Trans Union)

151.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

152.    The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day limitation for the completion of such an investigation. Id.

153.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  See 15 U.S.C. § 1681i(a)(5)(A).

154.    On numerous occasions in 2024, Plaintiff disputed the inaccurate information with the CRA Defendants and requested that they correct and/or delete specific items in his credit file that are patently inaccurate, misleading, and highly damaging to him, fraudulent information that was the product of identity theft which was an extremely stressful situation for the Plaintiff.

155.    Plaintiff disputed the identity theft information to the CRA Defendants several times.

156.    On at least one occasion, Plaintiff supported his dispute with a copy of the police report and the FTC ID Theft Report.

157.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Equifax conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

158.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Trans Union conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently

false and highly damaging information to remain and/or to be reinserted in Plaintiff's credit file.

159.    Plaintiff expended resources in the form of time and money to repeatedly dispute the fraudulent information with the CRA Defendants, repeatedly.

160.    Defendant Trans Union refusals to block the disputed fraudulent account provided credibility to that account, forcing an identity theft victim to be repeatedly confronted with the evidence of identity theft.

161.    The CRA Defendants' repeated refusals to block the disputed fraudulent information, forcing an identity theft victim to be repeatedly confronted with the evidence of identity theft.

162.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

163.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

164.    As a result of the CRA Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to his

credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove fraudulent information that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove fraudulent information that was the product of identity theft.

165.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the CRA Defendants.

166.    The CRA Defendants' conduct, actions, and inactions were willful, rendering the CRA Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, the CRA Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

167.    Plaintiff is entitled to recover attorneys' fees and costs from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681c-2**
**Failure to Block Identity Theft Information**
**(Third Claim of Relief Against Defendants Equifax and Trans Union)**

168.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

169.    Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

170.    Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

171.    Plaintiff repeatedly submitted ample evidence of the fact that he was an identity theft victim.  Plaintiff further supported the fact that he was an identity theft victim by providing to the CRA Defendants copies of the Police Report(s) and FTC IDT Report(s).

172.    The CRA Defendants should have blocked the identity theft information but failed to do so.

173.    As a result of the CRA Defendants ' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an fraudulent information that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove fraudulent information that was the product of identity theft.

174.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the CRA Defendants.

175.    The CRA Defendants' conduct, actions, and inactions were willful, rendering the CRA Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, the CRA Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

176.    Plaintiff is entitled to recover attorneys' fees and costs from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
## 15 U.S.C. § 1681s-2b
### Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer
### (First Claim of Relief Against Defendant EPT Only)

177.    Plaintiff incorporates by reference all the above allegations of this Complaint as though fully set forth herein at length.

178.    Defendant EPT caused the fraudulent Essex Property Trust Account to be added to Plaintiff's credit file, including, but not limited to, with the CRA Defendants.

179.    Defendant EPT refused to remove information that was the product of identity theft—namely the fraudulent Essex Property Trust Account.

180.    Defendant EPT violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including, but not limited to, by failing to review all relevant information regarding the same.

181.    As a result of Defendant EPT conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an fraudulent account that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the fraudulent account that was the product of identity theft.

182.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant EPT.

183.    Defendant EPT's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Defendant EPT was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

184.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant EPT in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants:

(a)    Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681;

(b)    An award of actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1681, *et. seq.*;

(c)    An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and § 1681o; and,

(d)    Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

### JURY DEMAND

Plaintiff is entitled to and hereby demands trial by jury on all issues so triable.

Respectfully submitted this 8th day of July 2025.

*/s/ Andrew J. Gramajo*
Andrew J. Gramajo, CA # 338144
AJG LAW GROUP, PC.
25A Crescent Dr. #402

33

1

Pleasant Hill, CA 94523
T:(415) 638-9140
E: Andrew@Ajglawgroup.us

*Attorney for Plaintiff*
*Zhengyu Zhang*